UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VANESSA ABREU-BATTLE,

       Plaintiff,                        Hon. Janet T. Neff

v.                                        Case No. 1:11-CV-1328

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

# STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 25 years of age on her alleged disability onset date and 31 years of age on the date of the ALJ's decision. (Tr. 11, 23, 129, 146-50). Plaintiff successfully completed high school and worked previously as a machine operator, food prep clerk, and laundry service worker. (Tr. 22, 41, 243-51).

Plaintiff applied for benefits on February 23, 2009, alleging that she had been disabled since March 15, 2005, due to fibromyalgia, bi-polar disorder, kidney stones, migraines, allergies, and blurred vision. (Tr. 11, 146-50, 234). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 75-126). On March 10, 2011, Plaintiff appeared before ALJ Donna Grit, with testimony being offered by Plaintiff and vocational expert, John Petrovich. (Tr. 35-68). In a written decision dated April 14, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 11-23). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on March 31, 2010. (Tr. 13). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must

establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

On September 6, 2002, Plaintiff participated in an MRI examination of her lumbosacral spine the results of which were "normal." (Tr. 500). Treatment notes dated May 2, 2005, indicate that Plaintiff was suffering from gastroparesis.[1] (Tr. 315-16). On September 13, 2005, Plaintiff participated in a CT scan of brain the results of which were "negative." (Tr. 657).

On June 8, 2006, Plaintiff participated in an ultrasound examination of her kidneys the results of which revealed "a mild degree of right-sided hydronephrosis."[2] (Tr. 345). The doctor was unable to determine "whether this is due to partial obstruction from a ureteral calculus or extrinsic compression of the right ureter due to the pregnant uterus." (Tr. 345). The doctor further observed that "there is a possible small non-obstructing calculus at the lower pole of the right kidney." (Tr. 345).

On May 2, 2007, Plaintiff participated in a CT scan of her brain the results of which were "normal." (Tr. 617).

On May 18, 2007, Plaintiff was admitted to St. Mary's Hospital for treatment of "increasing depression and anger." (Tr. 368-70). Plaintiff reported experiencing mood swings,

---

[1] Gastroparesis is a condition "that reduces the ability of the stomach to empty its contents," but "does not involve a blockage (obstruction)." *See* Gastroparesis, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001342/ (last visited on February 15, 2013).

[2] Hydronephrosis refers to "swelling of one kidney due to a backup of urine." *See* Unilateral Hydronephrosis, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001535/ (last visited on February 15, 2013). Hydronephrosis "is a condition that occurs with a disease," but "[i]t is not a disease itself." *Id.*

4

increasing depression, weight loss, restlessness, racing thoughts, difficulty sleeping, erratic eating habits, decreased energy, irritability, and anxiety. (Tr. 368). Plaintiff denied experiencing panic attacks, paranoia, or auditory or visual hallucinations. (Tr. 368). Plaintiff reported that she was not taking any "psych meds" or participating in any counseling. (Tr. 368). Plaintiff denied "significant alcohol use," but acknowledged that she "uses marijuana daily." (Tr. 369). Plaintiff's GAF score upon admission was 50.[3] (Tr. 370).

During her hospitalization, Plaintiff participated in therapy and began taking appropriate medication. (Tr. 359). Plaintiff was discharged from the hospital on May 29, 2007, at which point her affect was "brighter" and her mood "more stable" with "no more irritability or agitation." (Tr. 359). The doctor further reported that Plaintiff was no longer experiencing hypomanic symptoms or racing thoughts. (Tr. 359). It was also noted that Plaintiff was "sleeping better" and "less anxious." (Tr. 359). Upon discharge, Plaintiff exhibited "no psychotic or manic symptoms" and her "thought process is clear." (Tr. 359). Plaintiff's discharge diagnosis was bipolar disorder and cannabis abuse. (Tr. 359-60). Her GAF score was rated as 60.[4] (Tr. 360). Plaintiff's prognosis was "felt to be good with psychotherapy and medication and avoidance of substance use." (Tr. 360).

On July 23, 2007, Plaintiff participated in a psychiatric evaluation at Pine Rest Christian Mental Health Services. (Tr. 685-87). Plaintiff reported that she "goes through frequent

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

[4] A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

episodes of feeling irritable and moody...especially when she is anxious about something or in a hurry." (Tr. 685). The results of a mental status examination were unremarkable. (Tr. 686). Plaintiff was diagnosed with: (1) mood disorder, not otherwise specified, (2) rule out bipolar affective disorder, Type II, (3) rule out dysthymic disorder, and (4) history of cannabis dependence, in early remission. (Tr. 687). Plaintiff's GAF score was rated as 58.[5] (Tr. 687). Plaintiff's medication regimen was modified and she was encouraged to continue with therapy. (Tr. 687).

On August 27, 2007, Plaintiff was examined by Dr. Jan Ciejka, with the Arthritis Education and Treatment Center. (Tr. 376). Plaintiff reported that she was suffering from fibromyalgia. (Tr. 376). X-rays of Plaintiff's SI joints were "normal" and the results of numerous laboratory tests were unremarkable. (Tr. 376). An examination of Plaintiff's extremities was unremarkable and a musculoskeletal examination revealed no evidence of synovitis. (Tr. 376). Palpation of the fibromyalgia tender points was positive. (Tr. 376). Plaintiff was diagnosed with fibromyalgia. (Tr. 376). Her medication regimen was modified and she was instructed to perform stretching and range of motion exercises as well as low impact aerobic conditioning. (Tr. 376).

On June 20, 2008, Plaintiff's psychiatrist, Dr. Michael Thebert, reported that Plaintiff's "mood is entirely normal with no signs of depression or mood elevation. . .no signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." (Tr. 697). The doctor further reported that Plaintiff's "associations are intact, thinking is logical, and thought contend is appropriate" and "there are no signs of anxiety." (Tr. 697). Following an August 15,

---

[5] A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

2008 examination, Dr. Thebert offered a similar assessment of Plaintiff's mood and mental status. (Tr. 698).

On August 28, 2008, Plaintiff participated in a CT scan of her abdomen and pelvis the results of which revealed the presence of "multiple bilateral renal calculi." (Tr. 490-91). On September 15, 2008, Plaintiff underwent a procedure to treat kidney stones. (Tr. 504). Specifically, the doctors performed a "right ureteroscopic stone extraction with laser lithotripsy[6] [and] placement of double-J stint" and "left extracorporeal shock wave lithotripsy." (Tr. 504).

On October 31, 2008, Plaintiff participated in a CT scan of her abdomen and pelvis the results of which revealed "multiple bilateral renal calculi" with "fewer calculi in the left kidney than on the previous CT scan of 8/28/08." (Tr. 485-86). Plaintiff's abdomen and pelvis "otherwise appear[ed] normal." (Tr. 486).

On November 7, 2008, Plaintiff participated in an MRI examination of her brain the results of which were "negative." (Tr. 607).

On February 25, 2009, Dr. Ava Frunza completed a report concerning Plaintiff's functional abilities. (Tr. 506-12). The form which the doctor completed asked her to identify "the activities the patient can perform on a regular and continuing basis," defined as "8 hours a day for 5 days a week, or an equivalent work schedule." (Tr. 507). The doctor reported that Plaintiff can sit continuously for 15 minutes and can sit for a total of 3-4 hours during an 8-hour workday. (Tr. 507-08). The doctor reported that Plaintiff can stand and walk continuously for 30 minutes and can stand or walk for a total of four hours during an 8-hour workday. (Tr. 508-09). The doctor also

---

[6] Lithotripsy is "a medical procedure that uses shock waves to break up stones in the kidney, bladder, or ureter (tube that carries urine from [the] kidneys to [the] bladder)" after which "the tiny pieces of stones pass out of [the] body in [the] urine." *See* Lithotripsy, available at http://www.nlm.nih.gov/medlineplus/ency/article/007113.htm (last visited on February 15, 2013).

7

reported that Plaintiff needed to rest or lie down for three hours during an 8-hour workday. (Tr. 509). The doctor reported that Plaintiff can frequently lift/carry five pounds and can occasionally lift/carry 20 pounds. (Tr. 509-10). The doctor reported that Plaintiff can frequently balance and occasionally stoop and flex/rotate her neck. (Tr. 510).

On March 6, 2009, Plaintiff was examined by Dr. Bobga Fomunung. (Tr. 730-32). Plaintiff reported that she was experiencing depression and sleep difficulty. (Tr. 730). Plaintiff reported that she was not presently taking any medication but that previous medication provided her "with good response." (Tr. 730). Plaintiff reported that she "would like to get back on some medication because of her current symptoms of mania and depression." (Tr. 730). The doctor noted that Plaintiff "has a history of cannabis abuse although she has tried other substances in the past." (Tr. 731). Plaintiff reported that "she is craving marijuana but has not used it in quite awhile." (Tr. 731). The doctor reported that Plaintiff "presents today with symptoms of recurrent mania and depression," but the results of a mental status examination were otherwise unremarkable. (Tr. 731-32). Plaintiff was diagnosed with: (1) mood disorder not otherwise specified, (2) rule out bipolar II disorder, and (3) marijuana abuse. (Tr. 732). Plaintiff's GAF score was rated as 60. (Tr. 732). Plaintiff was prescribed appropriate medication. (Tr. 732).

On March 19, 2009, Plaintiff completed a report regarding her activities. (Tr. 257-64). Plaintiff reported that on a typical day she cares for her children, prepares meals, and reads stories to her children. (Tr. 257). Plaintiff also reported that she washes laundry, irons clothes, cleans her house, shops for groceries, watches television, and visits with friends. (Tr. 259-61).

On June 23, 2009, Plaintiff was examined by Glen Peterson, Ph.D. (Tr. 821-27). Plaintiff reported that she was disabled due to fibromyalgia, kidney stones, migraines, and bi-polar

disorder. (Tr. 825). With respect to her activities, Plaintiff reported that "every morning she gets up to fix breakfast for the children, and then spends time with them either playing or coloring." (Tr. 823). Plaintiff reported that she then "fixes lunch, and goes outside with the children." (Tr. 823). Plaintiff reported that "during the day she does laundry, cleaning, and cooking, and in the evening she fixes dinner for the family." (Tr. 823). Plaintiff exhibited no evidence of physical discomfort or impairment and the results of a mental status examination were unremarkable. (Tr. 823-25). The doctor concluded that "I do not believe [Plaintiff] has a bipolar disorder" and "[w]hen she describes a manic episode, it sounds like she is describing the experience of anxiety." (Tr. 826). With respect to Plaintiff's mental status and ability to work, the doctor observed the following:

> She will have no difficulty understanding and remembering simple instructions. She has no impairment in her ability to carry out simple instructions. She has no impairment with her ability to understand and remember complex instructions, and no impairment in her ability to make judgments on complex work-related decisions. She lacks emotional maturity, and she cannot be relied upon to be consistent in her interactions with others, including the public, supervisors, or coworkers. It is unlikely that she would be able to work for an extended period of time, without interruption from psychologically based symptoms.

(Tr. 826). The doctor diagnosed Plaintiff with dysthymic disorder, moderate, and generalized anxiety disorder. (Tr. 826). Plaintiff's GAF score was rated as 55. (Tr. 826).

On July 1, 2009, Plaintiff was examined by Dr. Richard Gause. (Tr. 829-31). The results of a musculoskeletal examination revealed the following:

> There was no evidence of joint laxity, crepitance, or effusion. Grip strength remains intact. Dexterity was unimpaired. The patient could pick up a coin, button clothing, and open a door. She was tender overlying the trapezii, as well as the quadriceps bilaterally. The patient had no difficulty getting on and off the examination table. No

9

difficulty heel and toe walking, no difficulty squatting and arising, and no difficulty hopping. Range of motion was normal in all joints.

(Tr. 830). The results of a neurological examination revealed the following:

Cranial nerves were intact. Motor strength was 5/5 and tone was normal. Sensory appeared intact to light touch. Reflexes were 2+ and symmetrical. Plantar responses were flexor. Romberg[7] testing was negative. The patient walked with a normal gait without the use of an assistive device. Straight leg raising was accomplished to 70 degrees on the right and 90 degrees on the left.

(Tr. 830).

On December 18, 2009, Plaintiff participated in a CT examination of her head and neck the results of which were "entirely normal." (Tr. 879).

Treatment notes dated May 17, 2010, indicate that Plaintiff participated in the Mary Free Bed "fibromyalgia program" from March 4, 2010 through May 13, 2010. (Tr. 904-07). As a result of her participation in this program, Plaintiff "reported a significant improvement in managing her pain." (Tr. 904).

On June 14, 2010, Plaintiff participated in a EEG examination the results of which were "normal." (Tr. 877).

Psychiatric treatment notes dated August 30, 2010, indicate that Plaintiff's "current medications are working fairly well for her" and that she is "seeing [a] therapist and working on coping skills." (Tr. 985).

On February 10, 2011, Dr. Seif completed a "mental impairment questionnaire" concerning Plaintiff's impairments. (Tr. 1072-77). With respect to Plaintiff's "mental abilities and

---

[7] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on February 22, 2013). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

aptitudes needed to do unskilled work," the doctor reported that Plaintiff possessed "no useful ability to function" in the following areas: (1) maintain attention for two hour segment, (2) work in coordination with or proximity to others without being unduly distracted, (3) complete a normal workday and work week without interruptions from psychologically based symptoms, (4) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, and (5) deal with normal work stress. (Tr. 1074).

The doctor also reported that Plaintiff was "unable to meet competitive standards" in the following areas: (1) maintain regular attendance and be punctual within customary, usually strict tolerances, (2) perform at a consistent pace without an unreasonable number and length of rest periods, and (3) accept instructions and respond appropriately to criticism from supervisors. (Tr. 1074). With respect to Plaintiff's "mental abilities and aptitude needed to do particular types of jobs," the doctor reported that Plaintiff was "unable to meet competitive standards" in the following areas: (1) interact appropriately with the general public, and (2) maintain socially appropriate behavior. (Tr. 1075). The doctor also reported that Plaintiff experienced "marked" restrictions in the activities of daily living, "extreme" difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (Tr. 1076). The doctor also reported that Plaintiff had experienced "three" episodes of decompensation within a 12 month period, each of at least two weeks duration. (Tr. 1076).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[8] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) fibromyalgia; (2) asthma; (3) kidney stones; (4) headaches; (5) abdominal adhesions; (6) gastroparesis; and (7) mood disorder, not otherwise specified, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-16).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[9] subject to the following limitations: (1) she cannot frequently climb ramps and stairs; (2) she cannot climb ladders, ropes, or scaffolds; (3) she must avoid concentrated exposure to extremes of cold, heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights and moving machinery; (4) she can understand, carry out, and remember simple instructions; (5) she must have less than frequent contact with the public and co-workers; and (6) she must have less than frequent changes to work environment or work expectations. (Tr. 16-17). A vocational expert testified that given her RFC, Plaintiff would be able to perform her past relevant work as a machine operator. (Tr. 62-64). Relying on this testimony, the ALJ concluded that Plaintiff was not entitled to benefits.

---

[9] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

a. The ALJ's Assessment of Dr. Seif's Opinion is Supported by Substantial Evidence

As noted above, on February 10, 2011, Dr. Seif completed a "mental impairment questionnaire" in which he reported that Plaintiff was unable to (1) maintain attention for a two hour segment, (2) work in coordination with or proximity to others without being unduly distracted, (3) complete a normal workday and work week without interruptions from psychologically based symptoms, (4) get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, (5) deal with normal work stress, (6) interact appropriately with the general public, and (7) maintain socially appropriate behavior. The doctor also reported that Plaintiff was "unable to meet competitive standards" in the following areas: (1) maintain regular attendance and be punctual within customary, usually strict tolerances, (2) perform at a consistent pace without an unreasonable number and length of rest periods, and (3) accept instructions and respond appropriately to criticism from supervisors. Dr. Seif reported that Plaintiff experienced "marked" restrictions in the activities of daily living, "extreme" difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. Plaintiff argues that because Dr. Seif was a treating physician, the ALJ was required to afford controlling weight to his opinion. Plaintiff argues that the ALJ's failure to do so entitles her to relief.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not

inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

With respect to Dr. Seif's opinion, the ALJ concluded as follows:

15

> Dr. Seif is not a psychiatrist, he is a psychologist and supervised by the Staff Psychiatrist. While the opinion of Dr. Seif is given consideration, it is found inconsistent with his own progress notes and inconsistent with the claimant's activities of daily living and presentation at the hearing. It is therefore given little weight.

(Tr. 22).

First, contrary to Plaintiff's argument, the ALJ did not reject Dr. Seif's opinion because he is a psychiatrist rather than a psychologist. The ALJ's reference to such appears to be nothing more than an observation that Dr. Seif was merely one of the professionals that treated Plaintiff at Pine Rest. This interpretation is further supported by the fact that the ALJ articulated specific reasons for discounting the doctor's opinion. As the ALJ observed, Dr. Seif's treatment notes do not support his opinion that Plaintiff is impaired to the extreme extent alleged. Instead, as the evidence discussed indicates, Plaintiff's emotional impairments responded well to therapy and medication. Furthermore, as the ALJ correctly concluded, Dr. Seif's opinion of extreme impairment and limitation is contradicted by Plaintiff's extensive activities and the observations of many of Plaintiff's other treaters. In sum, the ALJ's decision to discount Dr. Seif's opinion is supported by substantial evidence.

    b.    The ALJ's Assessment of Dr. Frunza's Opinion is Supported by Substantial Evidence

As noted above, on February 25, 2009, Dr. Frunza completed a report concerning Plaintiff's functional abilities. The doctor reported that during an 8-hour workday, Plaintiff can sit for 3-4 hours and stand/walk for four hours, but must also lie down for 3 hours. The doctor reported that Plaintiff can occasionally lift and carry 20 pounds and frequently lift and carry 5 pounds. Dr.

Frunza reported that Plaintiff can continuously sit for 15 minutes and stand/walk for 30 minutes. The ALJ afforded "little weight" to Dr. Frunza's opinion. (Tr. 22). Plaintiff asserts that because Dr. Frunza was her treating physician, the ALJ was required to afford controlling weight to her opinion.

The form that Dr. Frunza completed requested that she identify the extent to which Plaintiff can perform certain activities during an 8-hour workday. However, when identifying the amount of time during a work day that Plaintiff could sit and stand/walk, as well as the amount of time she allegedly must spend lying down, such adds up to 10-11 hours. As the ALJ concluded, the doctor's failure to correctly complete the form in question calls into question the validity of her opinions. Moreover, the opinion that Plaintiff must lie down for 3 hours during an 8-hour workday enjoys no support in the record. Likewise, the opinion that Plaintiff can lift no more than 5 pounds on a frequent basis is not supported by the record. In sum, the ALJ's decision to afford less than controlling weight to Dr. Frunza's opinion is supported by substantial evidence.

        c.        That Plaintiff was Erroneously Mailed a Draft of the ALJ's Decision is merely Harmless Error

Plaintiff further argues that she is entitled to relief because when she was notified by the Social Security Administration that her applications for benefits had been denied, such was accompanied by an initial draft of the ALJ's decision rather than the final version thereof. The administrative record initially submitted in this matter also contained the draft opinion in question. Defendant subsequently corrected the administrative record which now includes the final version of the ALJ's opinion.

17

Plaintiff has presented no evidence that the final version of the ALJ's decision contained in the amended administrative record was completed or produced subsequent to the date on which she was notified that her applications for benefits had been denied. The Court further notes that the differences between the ALJ's final decision and her earlier draft are merely stylistic and not substantive. Thus, even though Plaintiff was erroneously mailed a draft of the ALJ's final decision, such was sufficient to inform Plaintiff of the basis for the denial of her claim for benefits. To the extent that the draft opinion was insufficient in this regard Plaintiff should have contacted the Social Security Administration for correction or clarification. Plaintiff has not alleged, however, that she ever attempted to obtain from the Social Security Administration the final version of the ALJ's decision. In sum, Plaintiff has presented no evidence that what occurred in this instance was anything other than an honest, and ultimately harmless, error. Accordingly, this argument is rejected. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: March 4, 2013                    /s/ Ellen S. Carmody
                                       ELLEN S. CARMODY
                                       United States Magistrate Judge